UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
CARLOS BLACKMAN, et al.,

                      Plaintiffs,              MEMORANDUM
                                                  AND ORDER

       - against -
                                                    04-CV-1930 (SJ) (SMG)

NEW YORK CITY TRANSIT
AUTHORITY,

                      Defendant.
-----------------------------------------------------X
**Gold, S., United States Magistrate Judge:**

## Introduction

On May 10, 2004, plaintiffs Carlos Blackman, Mark Winslow, Robert Davenport, Joseph Semien, Luis Santana and Roger Toussaint, as President of the Transport Works Union, Local 100 (the "TWU" or "Local 100"), commenced this action against defendant New York City Transit Authority (the "NYCTA" or the "Transit Authority"), alleging a violation of plaintiffs' First Amendment rights. Pursuant to a Stipulation of Partial Dismissal, dated January 5, 2005, plaintiffs Winslow, Davenport, Semien, Santana and Toussaint dismissed their pending claims with prejudice, leaving Blackman as the only plaintiff. Docket Entry 11.

In the only remaining cause of action, Blackman, who was formerly employed by the NYCTA as a Subway Car Inspector, alleges that the NYCTA wrongfully terminated his employment in retaliation for his exercise of his First Amendment right to free speech. Docket Entry 1, Complaint ("Compl.") ¶ 11. Blackman is seeking (1) a permanent injunction enjoining the NYCTA from taking any further disciplinary actions against him and voiding his termination; (2) a judgment against the NYCTA in the amount of the wages and benefits Blackman lost as a

result of his discharge; and (3) reimbursement of Blackman's attorneys' fees and costs.[1]  Compl. at 5-6.

Defendant now moves for summary judgment, asserting that the NYCTA's decision to terminate Blackman's employment did not violate the First Amendment.  Defendant acknowledges that Blackman was fired because of the statements he made.  Defendant argues, however, that (1) the only statement at issue did not address a matter of public concern and was therefore not protected by the First Amendment and (2) even if Blackman's statement did in fact address a matter of public concern, his right to free speech was outweighed by the NYCTA's interest in maintaining a safe, orderly, productive and respectful working environment.  Docket Entry 15, Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") at 1-2, 6-8, 13-15.  Blackman opposes defendant's motion, arguing that (1) Blackman's statement did address a matter of public concern and (2) Blackman's right to free speech outweighed the NYCTA's interest in suppressing the speech or, at a minimum, this balancing test raises a genuine issue of material fact for trial.  Docket Entry 19, Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp.") at 1, 3-8, 9-14.

The parties have consented to have the undersigned decide defendant's motion for summary judgment.  Minute Entry for Feb. 11, 2005; Declaration of Richard Schoolman ¶ 2,

---

[1] Blackman also sought a preliminary injunction (1) requiring the NYCTA to reinstate his employment and (2) restraining the NYCTA from interfering with Blackman's performance of his responsibilities as an officer of Local 100.  Compl. at 5.  In an Order dated May 13, 2004, Senior United States District Judge Sterling Johnson Jr. denied plaintiff's request for a preliminary injunction, finding that plaintiff's allegations failed to sufficiently demonstrate a risk of irreparable harm to Blackman or others.  Docket Entry 3.

Docket Entry 17. Having considered the submissions of the parties, defendant's motion for summary judgment is granted.

## Facts[2]

During 2003 and 2004, Blackman, a fifteen-year veteran of the NYCTA, was employed as a Subway Car Inspector and assigned to the 240th Street Car Equipment Maintenance Shop (the "240th Street Shop"). Bennett Decl., Ex. 1 at 3. The 240th Street Shop is where subway cars are "cleaned, inspected, maintained, and repaired," and entry is limited to employees and other individuals transacting business with the NYCTA. Bennett Decl. ¶ 2. Beginning in 2003, Blackman also served as Local 100's Chairman of the 240th Street Shop, an elected union position. Bennett Decl., Ex. 1 at 3. Local 100 represents various employees of the NYCTA for purposes of collective bargaining. Bennett Decl. ¶¶ 1, 3.

**A.** **Blackman's December 4, 2003 Statement**

On December 4, 2003, Blackman approached his Maintenance Supervisor I, Pablo Perez, to express his concern that the hydraulic jacks which Blackman and two other employees were preparing to use to jack up a subway car were unsafe. Bennett Decl., Ex. 1 at 3-4. After Perez and his immediate manager examined the jacks and concluded that the equipment was safe, Blackman refused to use the hydraulic jacks and was eventually taken off the clock. Bennett Decl., Ex. 1 at 4-5.

---

[2] Plaintiff's Statement of Facts cites to the Bennett Declaration ("Bennett Decl.") and Biren Opinion and Award, Bennett Decl., Ex. 1, which were submitted by defendant in support of its motion for summary judgment. Similarly, in Plaintiff's Rule 56.1 Statement, Blackman "admits" the material facts discussed in this opinion are true. Docket Entry 20. Because the facts set forth herein are undisputed, I will cite to the Opinion and Award issued by Arbitrator Melissa H. Biren on September 8, 2004, which provides a complete account of the events pertinent to defendant's motion. See Bennett Decl., Ex. 1 at 2-9.

3

Perez then asked Blackman to leave the work area. In response, Blackman stated, "I may lose a couple of hours, but you will lose a lot more than that." Bennett Decl., Ex. 1 at 5. Blackman remained in the work area and, after Perez repeatedly asked Blackman to leave, Blackman responded, "Call the cops on me, go ahead and call the cops. . . . I wish that some day I'll read in the newspaper that something bad has happened to you and also to your kids." Id. at 5-6. When Perez again asked Blackman to leave the work area, Blackman stated, "I am not leaving; I have a TA pass, a Union card and a .38 and I'll call my brother." Id. at 6.

Perez was "upset" and "frightened" by Blackman's statements. Bennett Decl., Ex. 1 at 6. Based upon Blackman's remarks, the NYCTA prepared and filed a Disciplinary Action Notice ("DAN") against Blackman.³ Bennett Decl. ¶ 4. The NYCTA recommended that Blackman receive a 30-day suspension for his statements and conduct on December 4, 2003. Bennett Decl., Ex. 1 at 2. On Blackman's behalf, Local 100 objected to the DAN and pursued the grievance process outlined in the CBA.⁴ Bennett Decl. ¶ 4. Although two employee witnesses testified at

---

³ In accordance with the employment structure at the NYCTA, Maintenance Supervisor I's are responsible for (1) directly supervising Car Inspectors, Car Cleaners and individuals in various other titles and (2) ensuring that these individuals "adher[e] to a variety of NYCTA rules and regulations as well as supervisory and managerial directives." Bennett Decl. ¶ 2. Accordingly, Maintenance Supervisor I's are responsible for "writing up" any Disciplinary Action Notices ("DANs"), reporting any misconduct to the individuals who will "write up" the DANs or otherwise initiating disciplinary action against any employees who violate the NYCTA rules or supervisory directives. Bennett Decl. ¶¶ 2-3.

⁴ Pursuant to the collective bargaining agreement (the "CBA") entered into between Local 100 and the NYCTA, the discipline imposed by the DAN is not self-executing if either the employee or Local 100 on the employee's behalf objects to it. Bennett Decl. ¶ 3. The employee or Local 100 lodges the objection in the form of a grievance, which is then processed in accordance with the multi-step procedure outlined in the CBA. Bennett Decl. ¶ 3. If the initial steps of the grievance procedure fail to settle the dispute, the grievance is ultimately submitted to an independent arbitrator. Bennett Decl. ¶ 3. A private hearing is held before the arbitrator, who issues a final, binding decision regarding whether discipline should be imposed and, if so, the

the arbitration hearing that they did not hear Blackman's threatening statements, the arbitrator ultimately concluded that Blackman made the alleged statements. Bennett Decl., Ex. 1 at 15-16.

**B.      Blackman's March 1, 2004 Statement**

Blackman made a second statement on March 1, 2004. The statement was made during a discussion about the fatal shooting of two NYCTA supervisors. According to the Kings County Office of the District Attorney, on February 27, 2004, Darryl Dinkins, who had recently been fired from his position with the NYCTA as a Car Cleaner, shot and killed two of his former Maintenance Supervisor I's involved in his dismissal. Bennett Decl. ¶ 4. Dinkins had been terminated for playing dominos and failing to perform his assigned duties and for cursing and spitting at his supervisors. Bennett Decl., Ex. 2 at 2.

On March 1, 2004, the first day of work at the 240th Street Shop after the shooting, Hector Figueroa, a Maintenance Supervisor I, and Jeffrey Shutes, a Car Cleaner, were discussing the murders. Bennett Decl., Ex. 1 at 7-8. Shutes asked Figueroa what he thought about the killings, and Figueroa responded that it was a "bad" or "sad" situation. Bennett Decl., Ex. 1 at 8. At that point, Blackman joined the conversation and stated, "I hate to say this, but those two guys deserve what they got for getting the [Car Cleaner] fired." Bennett Decl., Ex. 1 at 8. Shutes subsequently asked Blackman, "[i]f you lost your livelihood, what would you do?" and Blackman responded, "[t]hose two scumbags deserved what they got for getting the [Car Cleaner] fired." Bennett Decl., Ex. 1 at 8.

Later that day, Figueroa repeated Blackman's statements to another Maintenance Supervisor I. Bennett Decl., Ex. 1 at 8. Both men were "upset" by Blackman's statements and

---

extent of the discipline. Bennett Decl. ¶ 3.

5

felt that the "same could happen to them." Bennett Decl., Ex. 1 at 8. Based in part upon subsequent conversations with his fellow supervisors, Figueroa decided to write up Blackman for the incident. Bennett Decl., Ex. 1 at 8-9.

While Local 100 was still grieving the DAN that Blackman received as a result of his statements to Perez on December 4, 2003, the NYCTA prepared and filed a DAN against Blackman based upon the statements he made on March 1, 2004. Bennett Decl. ¶ 4, Ex. 1 at 9. The NYCTA recommended that Blackman be dismissed from his employment for the two violations. Bennett Decl., Ex. 1 at 3. On March 8, 2004, Blackman was given a pre-disciplinary suspension. Bennett Decl., Ex. 1 at 9. On Blackman's behalf, Local 100 objected to the DAN and pursued the grievance process as outlined in the CBA. Pl.'s Opp. at 3; Def.'s Mem. at 5.

## C. Arbitrator Biren's Opinion

As a culmination of the grievance process involving both DANs, Arbitrator Biren held a four-day hearing involving testimony from 17 witnesses, including Blackman. Bennett Decl., Ex. 1 at 10. Ultimately Biren issued an opinion finding that the NYCTA had cause to terminate Blackman's employment. Bennett Decl., Ex. 1 (containing the complete text of Arbitrator Biren's Opinion and Award). As explained in great detail in her opinion, Arbitrator Biren concluded that Blackman made the statements as alleged on December 4, 2003 and March 1, 2004. Bennett Decl., Ex. 1 at 10, 15, 18. Additionally, Biren determined that Blackman violated three provisions of the NYCTA's Rules and Regulations Conduct of Employees by making these statements.[5] Bennett Decl., Ex. 1 at 17-18, 22.

---

[5] Specifically, Arbitrator Biren found that Blackman violated Rules 10(a), 10(c) and 10(d). Bennett Decl. ¶ 5 and Ex. 1 at 17-18, 22. Rule 10(a) provides that an employee's conduct must "be such as to merit the confidence and respect of" the employee's superiors; Rule 10(c)

Arbitrator Biren stated that if "only one violation had been established in [Blackman's] case, a suspension for a significant period of time, rather than discharge, may have been the appropriate penalty." Bennett Decl., Ex. 1 at 32. Because Blackman used "offensive, threatening and intimidating language" on two different occasions within a few months of each other, however, the arbitrator concluded that the NYCTA's decision to terminate Blackman's employment was appropriate. Bennett Decl., Ex. 1 at 32. Before the arbitrator, Local 100 argued that Blackman could not be subjected to discipline for the statements that he made on March 1, 2004 because he was exercising his First Amendment right to free speech. Bennett Decl., Ex. 1 at 24. Biren, however, concluded that Blackman's statements did not address a matter of public concern, and, even if his statements did address a matter of public concern, the potential disruptiveness of the statements outweighed any First Amendment right that Blackman had. Bennett Decl., Ex. 1 at 25-27.

## Discussion

**A.      Standards Governing Summary Judgment**

When deciding a motion for summary judgment, a court must assess whether there are any genuine issues of material fact to be tried. Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991). A factual dispute is material if it "might affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

---

provides that employees must treat "their fellow employees with courtesy"; and Rule 10(d) provides that employees "must not make threatening gestures towards, or commit assault or battery against, any person, nor use loud, uncivil, indecent or profane language." Bennett Decl. ¶ 5 and Ex. 1 at 17-18, 22.

Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The court resolves any ambiguities and draws all reasonable inferences in favor of the nonmoving party. See Coach Leatherware Co., 933 F.2d at 167. However, "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment," who must instead "set forth specific facts . . . showing a genuine issue exists for trial." Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

**B.     First Amendment Retaliation**

The Supreme Court has firmly established the principle that public employees do not abandon their First Amendment right to free speech as a condition of employment. Garcetti v. Ceballos, __ U.S. __, __, 126 S. Ct. 1951, 1957 (2006); San Diego v. Roe, 543 U.S. 77, 82-84, 125 S. Ct. 521, 524-26 (2004); Connick v. Myers, 461 U.S. 138, 142, 103 S. Ct. 1684, 1687 (1983). That right, however, is not unlimited. It is well settled that only speech that pertains to a matter of public concern is protected. Garcetti, __ U.S. at __, 126 S. Ct. at 1958; Connick, 461 U.S. at 146, 103 S. Ct. at 1690; Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35 (1968). Even when addressing speech regarding a matter of public concern, courts must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S. Ct. at 1734-35.

To prevail on a First Amendment retaliation claim, a plaintiff must establish by a preponderance of the evidence that "(1) [the] speech was constitutionally protected; (2) [he or] she suffered from an adverse employment action; and (3) [the] speech was a motivating factor in the adverse employment determination. . . ." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir.

8

2002).⁶ See also Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999). In this case, Blackman, who was terminated, clearly suffered an adverse employment action, and the NYCTA has acknowledged that its decision to terminate Blackman's employment was based on his December, 2003 and March, 2004 statements. Thus, only the first element identified in Phillips – whether Blackman's speech was protected – need be addressed.

Blackman concedes that the statements he made on December 4, 2003 to Maintenance Supervisor Pablo Perez did not address a matter of public concern and were as a result not protected by the First Amendment. Pl.'s Opp. at 1; Pl.'s 56.1 Statement ¶ 2. The question raised by the pending motion, therefore, is whether Blackman's statement on March 1, 2004 that the murdered supervisors were "scumbags" who "deserve[d] what they got" may be "fairly characterized as constituting speech on a matter of public concern." Connick, 461 U.S. at 146, 103 S. Ct. at 1689-90.

Speech on a matter of public concern is broadly defined as speech "relating to any matter of political, social, or other concern to the community." Id. at 146, 103 S. Ct. at 1689-90. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48, 103 S. Ct. at 1690. A court may determine whether speech is protected as a matter of law. Id. at 148 n.7, 103 S. Ct. at 1691.

By way of contrast, speech on matters of personal interest, which is not protected,

---

⁶ If a plaintiff establishes these elements, a defendant may still prevail if it can show that it would have taken the same adverse action despite the protected speech. Mt. Healthy Bd. of Ed. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977). Because I find that plaintiff's speech was not protected, I do not reach this issue.

includes speech about private employee grievances, personnel decisions, and disciplinary policies. See Tiltti v. Weise, 155 F.3d 596, 602-03 (2d Cir. 1998) (rejecting First Amendment claim with respect to statements complaining about nature of work assignments and rate of pay because "expressing dissatisfaction with working conditions is not, by itself, speech on matters of public concern"); Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1993); Gros v. Port Washington Police Dist., 944 F. Supp. 1072, 1078-79 (E.D.N.Y. 1996). See also Serrato v. Bowling Green State Univ., 252 F. Supp. 2d 550, 555 (N.D. Oh. 2003) (stating that an "internal employee grievance is the quintessential example of a matter of private concern"). The Supreme Court has cautioned that a "federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency" against an employee speaking "upon matters only of personal interest." Connick, 461 U.S. at 147, 103 S. Ct. at 1690.

As demonstrated by the Supreme Court's analysis in Connick, speech may involve private rather than public matters even when the statements at issue are not strictly limited to the personal circumstances of the speaker. The plaintiff in Connick was an Assistant District Attorney who was upset about a job transfer. When her efforts to have the transfer rescinded were unsuccessful, plaintiff decided to circulate a questionnaire to her co-workers seeking their views about the office's transfer policy, office morale, whether a grievance committee should be formed, the level of confidence in supervisors, and whether employees felt pressured to work on political campaigns. 461 U.S. at 141, 103 S. Ct. at 1687. Plaintiff was fired for having distributed the questionnaire. She subsequently brought suit, challenging her termination on First Amendment grounds. The Supreme Court, reversing the decision reached below, concluded that

all of the items on the questionnaire except the question about political campaigns related to plaintiff's dispute over her transfer and did not rise to the level of speech on a matter of public concern protected by the First Amendment:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark – and certainly every criticism directed at a public official – would plant the seed of a constitutional case. . . . [T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

461 U.S. at 149, 103 S. Ct. at 1691.

Considering its "content, form, and context," Id. at 147-48, 103 S. Ct. at 1690, it is clear that Blackman's statement did not address a matter of public concern. Blackman's March 1, 2004 statement was made at the workplace, in an area where access was restricted, to two fellow NYCTA employees. Moreover, particularly when considered in context, the statement that supervisors who terminate employees deserve to be shot and killed was wholly personal in nature. First, Blackman had made a threatening statement only four months earlier which led his supervisors to prepare a DAN against him, and Blackman was still in the process of grieving the previous DAN when he made the March 1, 2004 statement. Moreover, Blackman's statement was not made in the context of a debate concerning workplace safety or any other NYCTA policy. Indeed, Dinkins, the terminated employee accused of having murdered his supervisors, had been fired for playing dominos instead of attending to his assigned duties and cursing and spitting at his supervisors. See Bennett Decl., Ex. 2 at 2. Even if it might be argued that a discussion about a fired employee shooting his supervisor might relate to a matter of public concern if the employee had been fired because he was involved in controversial activities

11

important to the public – for example, promoting safety or ferreting out fraud and abuse – that was not the case here. To the contrary, the only message Blackman was attempting to communicate by stating that the murdered supervisors were "scumbags" who "deserved what they got for getting the [Car Cleaner] fired" was one of anger and frustration at supervisors who wrote up workers like himself for misconduct at the workplace. See Lewis v. Cohen, 165 F. 3d 154, 163-64 (2d Cir. 1999) ("[T]he court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose."); Ezekwo, 940 F.2d at 781 (finding that plaintiff's speech did not involve matters of public concern where plaintiff was "not on a mission to protect the public welfare[; r]ather her primary aim was to protect her own reputation"); Hueston v. City of New York, 2005 WL 53256, at *7 (S.D.N.Y. Jan. 10, 2005) (finding plaintiff's motivation "[p]articularly relevant" in determining whether the speech addressed a matter of public concern); Dodds v. Childers, 933 F.2d 271, 274 (5th Cir. 1991) (finding plaintiff's primary concern in making the statement was personal and therefore not protected). Cf. Reuland v. Hynes, __ F.3d ___, 2006 WL 2391163, at *8 (2d Cir. Aug. 21, 2006) (holding that statement involved a matter of public concern because it "did not relate to employment policies or other internal workplace grievances" and because "the statement was made in an interview with a magazine with public circulation and not simply to co-workers").

Blackman's argument that his speech should be protected because the murders were newsworthy is unfounded. Plaintiff contends his statement addressed a matter of public concern because the murders received widespread media coverage and the public was "faced with the uncertainty of public transportation service disruptions." Pl.'s Opp. at 5-6. Media attention

12

alone, however, does not convert a statement involving a personal matter into one protected by the First Amendment. See Koch v. City of Hutchinson, 847 F.2d 1436, 1445 (10th Cir. 1988) (noting that "what is of general interest to the public is not necessarily of public concern for First Amendment purposes"); Egger v. Phillips, 710 F.2d 292, 316-17 (7th Cir. 1983) ("[I]n assessing whether the speech touches upon a matter of public concern, it is important not to equate the public's curiosity about a matter with a matter having societal ramifications."). Moreover, it is plain from the context in which he made his statement that Blackman did not opine that the murdered supervisors "deserved what they got" primarily as a citizen concerned about potential public transportation disruptions. See Dodds, 933 F.2d at 273 ("To rise to the level of public concern, the speech must have been made primarily as a citizen rather than as an employee."). In any event, what was newsworthy must certainly have been the shootings; Dinkins' misconduct and the apparently poor working relationship between certain NYCTA supervisors and workers would undoubtedly have garnered no media attention whatsoever had Dinkins not murdered his bosses.

Blackman's reliance on Rankin v. McPherson is similarly misplaced. 483 U.S. 378, 107 S. Ct. 2891 (1987). Rankin involved two county employees discussing a radio bulletin reporting the attempted assassination of President Reagan. Id. at 381, 107 S. Ct. at 2895. During the conversation, McPherson commented that "if they go for him again, I hope they get him." Id. The Court concluded that the statement was protected as speech on a matter of public concern, finding that it was made in the course of a discussion about the federal government's policies. Id. at 386, 107 S. Ct. at 2898. Plaintiff argues that his case is like Rankin because the shooting of the NYCTA supervisors, like the attempt on President Reagan's life, received substantial media

13

attention. Pl. Opp. at 6. As discussed above, however, a statement is not necessarily protected even if its subject matter garners media attention. More to the point, unlike Blackman's statements, the speech in Rankin could reasonably be understood as a commentary (even if a crude one) on national affairs and clearly had nothing to do with the speaker's private workplace concerns; in contrast, Blackman was speaking about internal workplace relationships between supervisors and staff. Thus, the Court's reasoning in Rankin does not support plaintiff's position.

Blackman's statement "reflect[s] one employee's dissatisfaction" with his supervisors and their role in the disciplinary process and not any matter of public concern. Connick, 461 U.S. at 148, 103 S. Ct. at 1691. See also Serrato, 252 F. Supp. 2d at 551, 556 (finding that employee's complaint that she was concerned for her safety after a co-worker threatened to "bring a gun in and kill" her was not protected speech, despite plaintiff's argument that the threats involved public safety and that her statements were therefore matters of public concern); Quinn v. City of Johnstown, 1998 WL 187404, at *5 (N.D.N.Y. Apr. 15, 1998) (concluding that a police sergeant's comments that city administration officials "should be shot" were not criticisms of public policy worthy of protection because they lacked any reference to matters of public concern). I therefore find as a matter of law that Blackman's statement that they "deserve[d] what they got" is not protected speech, and that Blackman's First Amendment claim must therefore be dismissed. Because I find that the speech at issue is not protected, I do not reach the Pickering balancing test.

## Conclusion

For the reasons stated above, defendant's motion for summary judgment is granted. The

Clerk of Court is directed to enter judgment accordingly and close the case.

/s/
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
September 13, 2006